J-A12029-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE ADOPTION OF: A.S.N. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.L.N., NATURAL | : | |
| FATHER | : | No. 135 WDA 2020 |

Appeal from the Decree Entered November 22, 2019
In the Court of Common Pleas of Warren County
Orphans' Court at No(s): A.N. No. 12 of 2019

| | | |
|---|---|---|
| IN THE ADOPTION OF: S.L.N. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.L.N., NATURAL | : | |
| FATHER | : | No. 136 WDA 2020 |

Appeal from the Decree Entered November 22, 2019
In the Court of Common Pleas of Warren County
Orphans' Court at No(s): A.N. No. 13 of 2019

BEFORE:   KUNSELMAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY KING, J.:                    **FILED MAY 22, 2020**

Appellant, J.L.N. ("Father"), appeals from the decrees entered in the

Warren County Court of Common Pleas, which granted the petitions of

Appellee, Warren County Children and Youth Services ("CYS"), for involuntary

_____

[*] Retired Senior Judge assigned to the Superior Court.

termination of Father's parental rights to his minor children, A.S.N. and S.L.N. ("Children").[1] We affirm.

In its opinion, the trial court fully and correctly set forth the relevant facts and procedural history of this case. Therefore, we have no reason to restate them. Procedurally, we add that this Court consolidated Father's appeals *sua sponte* on February 14, 2020.

Father raises the following issues for our review:

> DID THE TRIAL COURT PROPERLY RULE THAT TERMINATION OF [FATHER'S] PARENTAL RIGHTS TO THE CAPTIONED MINOR CHILDREN WAS WARRANTED, IN TERMS OF ESTABLISHING BY CLEAR AND CONVINCING EVIDENCE THAT THE ELEMENTS OF 23 PA.C.S.A. § 2511(A)(1), (2), (5) AND (8) WERE MET?
>
> DID THE TRIAL COURT PROPERLY RULE THAT TERMINATION OF [FATHER'S] PARENTAL RIGHTS TO THE CAPTIONED MINOR CHILDREN WAS WARRANTED IN CONSIDERATION OF THE DEVELOPMENTAL, PHYSICAL AND EMOTIONAL NEEDS AND WELFARE OF THE CHILDREN, AS REQUIRED [BY] 23 PA.C.S.A. § 2511(B)?

(Father's Brief at 4).

Appellate review of termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

---

[1] Mother filed separate appeals from the termination decrees, which are docketed at No. 140 WDA 2020 and 141 WDA 2020. This Court consolidated Mother's appeals *sua sponte* on February 14, 2020.

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972

A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191-92 (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d

1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165

(2008)).

CYS filed a petition for the involuntary termination of Father's parental rights to Children on the following grounds:

### § 2511.  Grounds for involuntary termination

**(a)   General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

*    *    *

(5)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

*    *    *

(8)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from

the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his… parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Termination under Section 2511(a)(1) involves the following:

To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence

of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.
>
> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his… conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his… parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not

- 6 -

limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. ***In re A.L.D.***, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." ***Id.*** at 340. Under Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In Interest of Lilley***, 719 A.2d 327, 330 (Pa.Super. 1998).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." ***In re Z.P., supra*** at 1118.

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." ***In re Adoption of M.E.P.***, 825 A.2d 1266, 1275-76 (Pa.Super.

2003). "Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of CYS supplied over a realistic time. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of CYS services. *In re Adoption of T.B.B.*, 835 A.2d 387, 396 (Pa.Super. 2003); *In re Adoption of M.E.P., supra*.

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have his… rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his… ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with …her physical and

emotional needs.

***In re B., N.M., supra*** at 855 (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of his… child is converted, upon the failure to fulfill his… parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." ***Id.*** at 856.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Gregory J. Hammond, we conclude Father's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (***See*** Trial Court Opinion, dated January 22, 2020, at 6-17) (finding: **(1)** Children have been in CYS' care since June 2018; for entire time Children have been in placement, Father has made no real effort to maintaining his sobriety, finding stable housing, or securing employment; Father abandoned rehab after only 9 days and missed numerous drug and alcohol therapy appointments; Father mostly worked "under the table" at unverified jobs; Father ignored phone calls and avoided house calls from his caseworkers; Father took all available services and assistance for granted without actually trying to use them to better himself and reunite with Children; court does not believe Father will treat these services any differently once he is released from incarceration; Father's persistent drug use, criminal acts, and lack of motivation demonstrate Father's refusal or inability to parent; termination of

Father's parental rights was proper under Section 2511(a)(1), (2), (5), and (8); **(2)** although Children had some good moments with their parents, these moments do not make up for uncertainty Children presently face; Dr. von Korff, CYS expert and licensed clinical psychologist, testified that Children will benefit from having permanency in secure environment as soon as possible; parents have not spent any significant time alone with Children in over 1½ years; Dr. von Korff testified that termination is in Children's best interest, regardless of any parental bond; thus, termination of Father's parental rights was proper under Section 2511(b)).  Accordingly, we affirm based on the trial court's opinion.

Decrees affirmed.

Judge Colins joins this memorandum.

Judge Kunselman concurs in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date:  5/22/2020

Circulated 05/13/2020 10:21 AM

**IN THE COURT OF COMMON PLEAS**
**OF THE 37TH JUDICIAL DISTRICT OF PENNSYLVANIA**
**WARREN COUNTY BRANCH**
**ORPHANS' COURT DIVISION**

IN RE: ADOPTION OF                                            AN 12 of 2019
___ A.S.N.
D.O.B. 07. /15

IN RE: ADOPTION OF                                            AN 13 of 2019
___ S.L.N.
D.O.B. 08/ /16

**MEMORANDUM OPINION**

Presently before the Court for consideration are Notices of Appeal and Statements of

Matters Complained of on Appeal filed by J.R.L. ___ ("Mother") and J.L.N.

. ("Father") on December 23, 2019 in response to the Court's Involuntary Termination of

Parental Rights to their minor children, A.S.N. and S.L.N. ("Children"). Mother and Father both

assert that the Court did not have enough evidence to terminate their parental rights under the

bases of 23 Pa. C.S.A. §2511(a)(1), (2), (5), and (8). The Court first directs the Superior Court to

this Court's findings and opinion set forth on the record at the conclusion of the hearing. (*TPR*

*Tr. at 239:5-269:17*). This opinion is intended to supplement these findings and opinion. Also, as

the cases were consolidated for hearing; the matters complained of on appeal by the parents are

identical; and the findings of fact and legal issues are largely overlapping; this Court has entered

a single opinion in these matters. The Court issues the following Opinion pursuant to Pa. R.A.P.

1925(a)(2).

1

## FACTUAL AND PROCEDURAL BACKGROUND

In early 2018, Mother, Father, and Children were identified by New York State child welfare agencies as homeless as they were found to be residing in either their vehicle or various hotels. Mother and Father's alleged illegal drug use was also at issue and on May 16, 2018, they both tested positive for methamphetamine and amphetamines. After being informed that Chautauqua County, New York child welfare authorities were preparing to detain Children, Mother and Father decided to move the family into the home of Mother's father, V. M. in Warren County, Pennsylvania. On or about May 18, 2018, Warren County Children and Youth Services ("CYS") met with the family and assisted them in obtaining medical assistance insurance for Children. Less than two (2) weeks later, V. M. asked the family to leave his home because he suspected Mother and Father were using drugs. This was proven to be true on June 1, 2018, when they both tested positive for methamphetamine.

Mother and Father left Children with a friend, C. W. who ultimately contacted Warren County CYS on June 11, 2018 to inform them that she would no longer be able to provide care for Children. While Children were in the homes of V. M. and C. W., they were given much needed medical care by addressing out-of-date vaccinations and untreated MERSA. On June 13, 2018, Warren County CYS filed a petition for, and was granted, emergency custody of Children, who have remained in Warren County CYS custody since that date. A Shelter Care hearing was held on June 14, 2018 and a Dependency hearing was subsequently held on September 5, 2018 where both Mother and Father were drug tested with positive results. Father tested positive for Suboxone and Mother tested positive for

2

amphetamines and Suboxone while also facing Retail Theft (F-3) charges in Warren and McKean Counties. Mother testified that she had been treating with Subutex for eight (8) years and Father had been treating with Subutex for six (6) years. At the time of the September hearing, their housing situation was still not fully resolved as they only had a verbal sublet agreement accompanied by several incident reports to the local police for domestic and landlord/tenant disputes.

Starting on October 12, 2018, Mother served two (2) months in the Warren County Prison for Felony Retail Theft and was also convicted of Felony Retail Theft in McKean County, for which she was sentenced to two (2) years of probation, supervised by Warren County Adult Probation Department. While incarcerated, Mother declined visits with Children and while Father did attend supervised visits with Children, he was unable to maintain permanent housing.

A Permanency Review hearing was held on December 18, 2018 where the Court found that although the Mother and Father visited Children, they failed to meaningfully address their drug, alcohol, and mental health addictions/treatments, failed to obtain housing, and failed to secure employment and/or income. Following the hearing, both Mother and Father tested positive for Subutex, for which they were still obtaining prescriptions from a Subutex clinic. The Juvenile Court found minimal compliance with the permanency plan and no progress towards finding a solution for the circumstances which originally caused Children's initial placement.

A second Permanency Review hearing, held over the course of three (3) days, ended on May 21, 2019 where Mother and Father were found to be living in an appropriate home (EOC-subsidized housing) for themselves and Children. Mother was working a part-time job, attending most of her individual drug and alcohol counseling appointments, had obtained a mental health

3

evaluation, and had not tested positive for drugs since December 2018. Father was working "under the table" in New York and had only attended 40% of his scheduled outpatient drug and alcohol treatment sessions. He admitted himself for nine (9) days to a program which he left prematurely on April 17, 2019 and did not seek any other subsequent drug or alcohol treatment. He did obtain a mental health evaluation; however, he was dishonest throughout its entirety regarding his drug use. Immediately following the second Permanency Review hearing on May 21, 2019, Father tested positive for methamphetamine, amphetamines, and buprenorphine. The Juvenile Court conditioned continued supervised visitation between Father and Children upon his enrollment in a drug and alcohol program as well as testing negative for drugs.

From May to July 2019, Mother continuously requested that CYS allow Children to visit with Father due to his enrollment in drug and alcohol treatment and his alleged sobriety. CYS originally declined her requests, but on July 2, 2019 they arranged for Father to be drug tested at the Warren County Adult Probation Office where he was found to be concealing drug-free urine. He was immediately arrested and pled guilty one week later.

After Father's arrest, Mother was requested to submit to a drug test. Upon arrival at the Warren County Courthouse, she was immediately arrested and charged with furnishing drug-free urine, make/repairs/sell/etc. offensive weapons (brass knuckles found in her purse) and misdemeanor counts of possession of controlled substance by a person not registered and furnishing drug-free urine. She has been incarcerated on probation and parole violation charges arising from this incident since July 2, 2019 and she also has pending charges in Warren County and in New York.

Father was released from incarceration on July 9, 2019 and was subsequently arrested three (3) days later from a traffic stop resulting in felony charges of Aggravated Assault,

4

Possession with Intent to Deliver Controlled Substance, Endangering the Welfare or Children, and additional misdemeanors.

Children have been in placement for fourteen (14) months and during this time Mother and Father have had short-lived progress (if any), participated in trying to deceive authorities regarding their alleged sobriety, and have not addressed their addictions in any meaningful or successful way. Both Mother and Father are currently incarcerated and due to pending felony offenses, could possibly be incarcerated for a significant amount of time in the near future.

On August 29, 2019, Warren County Children and Youth Services filed a Petition for Involuntary Termination of Parental Rights ("Petition") of Natural Mother and Natural Father. An evidentiary hearing was held on November 21, 2019 where Attorney Rene H. Johnson represented Warren County CYS, Attorney Cynthia K. D. Klenowski represented Mother, Attorney Alan M. Conn represented Father, and Attorney Andmoragan C. Sharp represented Children's legal and best interests. After the hearing and review of the record, the Court terminated the parental rights of Mother and Father pursuant to 23 Pa. C.S.A. §2511(b) and 23 Pa. C.S.A. §2511(a)(1), (2), (5), and (8). A Decree of Termination was filed the following day.

On December 18, 2019, Father filed a Motion to Proceed in Forma Pauperis, Notice of Appeal, and Statement of Matters Complained of on Appeal. Mother also filed a Motion to Proceed in Forma Pauperis, Notice of Appeal, and Statement of Matters Complained of on Appeal on December 23, 2019. Considering the fact that Mother and Father filed separate appeals alleging the same issues, the Court will address each issue, by parent, for the sake of judicial economy.

5

# CONCLUSIONS OF LAW

The first issue raised by both Mother and Father is whether the Court erred in finding that Warren County CYS proved by clear and convincing evidence that for a period of at least six (6) months immediately preceding the filing of the petition that Mother and Father either showed settled purposes of relinquishing parental claim to Children or refused or failed to perform their parental duties. **Pa. C.S.A. §2511(a)(1).** The Petition was filed on August 29, 2019 which makes the six (6) month period run from the beginning of February 2019 until the end of August 2019. However, the Court cannot simply look at this six (6) month time period without taking into consideration the entire history of the case. "The court should consider the entire background of the case and not simply: mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his ... parental rights..." **In re Z.P.,** 994 A.2d 1108, 1117 (Pa. Super. 2010) (citing **In re B., N.M.,** 856 A.2d 847, 855 (Pa. Super. 2004)). The Court will consider the period of time from when Children were first put into placement, June 2018, until the time the Petition was filed in August 2019.

Mother claims that she maintained a relationship with Children and a role in their lives even while they were placed outside of her home and that she utilized the resources available to her in order to fulfill her parental duties as much as she could. The Court only needs to find that a parent either shows a settled purpose of relinquishing parental claim to their children or has refused or failed to perform their parental duties. Seeing as Mother made substantial progress towards her sobriety, found a job and a suitable home at the time of the May 2019 dependency hearing, the Court does not find that Mother showed a settled purpose of relinquishing her

6

parental claim. However, the Court does find that Mother failed to perform her parental duties, not only during the six (6) months prior to the filing of the Petition, but going back to June 2018 when the girls were initially put into placement.

In June 2018, Children were put into placement because of Mother and Father's drug use, lack of medical attention, and inability to maintain a suitable place to live. Mother and Father have not had custody of Children since then. Although Mother attended most of her scheduled visits with Children, there were times that these visits were missed. "There were a few they missed. One of them usually would miss due to illness.. Mother missed one after she worked her first shift at Whirley, because she was just too tired." *TPR Tr. at 192:9-13*. Mother worked at Whirley for a few weeks, but quit soon after. She also worked at Dairy Queen for a short time, but was let go. There has been no real concerted effort on Mother's part to find and maintain employment. Parental duties involve more than just showing up, when it is convenient or enjoyable, for a few hours to visit with your children. Mother repeatedly failed drug tests, was arrested, and continued living with Father even though the Court advised against it. At a dependency hearing in May 2019, the Court advised Mother that it would be in her and Children's best interests to no longer live with Father due to her attempt at sobriety, but they continued to live together until they were both arrested on July 2, 2019. "[I]f anything, she advocated for him. And, continued to plan for the four of them to be reunited as a family. She at no time presented that she was going to parent without him." *TPR Tr. at 203:17-21*. Since Children were put into placement, Mother has failed to perform her parental duties by continuing to partake in the actions and behaviors that led to her children being taken away in the first place.

Father claims that he attended regular visits with Children prior to his incarceration and that he made efforts to receive help and treatment for his substance abuse issues by attending

7

drug and alcohol treatment. Father's explanation for his failure to perform his parental duties is because of his drug issues, criminal charges, lack of employment, and lack of stable housing. The Court finds that Father both evidenced a settled purpose of relinquishing his parental claim to the Children and that he failed to perform his parental duties.

From the time Children were put into placement in June 2018, Father never had a period of time where he gave any real effort to his sobriety, finding stable housing, or finding employment. Because of the severity of his addiction issues, the Court entered an order stating that Father had to be involved in treatment and testing clean in order to have contact with his children. "Father abandoned rehab after only nine (9) days. In his words, he said that there were…people there that were using and dealing. And, that it wasn't to his benefit to be there." *TPR Tr. at 113:20-22.* Wanting to make a change and actually making a change are two very different ideas. "He always stated that he wanted the help. But, he didn't follow through with the help…and there were many times at the visit that he would appear somewhat impaired." *TPR Tr. at 114:15-22.* Father's only verifiable employment was from March 1, 2019 until early April, when he worked at Targeted Pet Treats. Otherwise, he was working "under the table" which meant that any income, jobs performed, or hours worked were unverified. Father's persistent drug use, numerous criminal acts, and lack of motivation to better himself in order to get his children back are a few of the many reasons why the Court finds that he has evidenced a settled purpose of relinquishing his parental claim to Children and that he has failed to perform his parental duties.

The second issue raised by both Mother and Father is whether the Court erred in finding that Warren County CYS proved by clear and convincing evidence that their repeated and continued incapacity, abuse, neglect, or refusal caused Children to be without essential parental

8

care, control, or subsistence necessary for their physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by Mother or Father. **Pa. C.S.A. §2511(a)(2).** This section "emphasizes the child's present and future need for essential parental care, control, or subsistence necessary for his physical or mental well-being." **In re E.A.P.**, 944 A.2d 79, 82 (Pa Super. 2008). As such, "the orphan's court should not ignore a child's need for a stable home and strong, continuous parental ties…this factor is particularly important when the disruption of the family has already occurred and there is no reasonable prospect for reuniting it." **In re Adoption of K.M.G.**, 219 A.3d 662, 673 (Pa. Super. 2019) (*citing* **In re E.A.P.**).

Mother claims that she utilized the resources available to her to fulfill her parental duties in order to care for Children to the extent that she could and presented evidence that any limitations to performing parental duties would be rectified within one year. Children have been in placement since June of 2018 and since that time, Mother has not only continued her drug use, but she has also been arrested and is currently incarcerated. Dr. Von Korff, a clinical psychologist, testified at the hearing about his interviews and evaluations of both parents. His professional opinion regarding Mother's addiction issues and her potential to overcome those issues in the near future painted a bleak picture. "I would approach any, any, sort of rehabilitative work with her, with a great deal of caution and skepticism and require evidence." *TPR Tr. at 53:15-18.* Not only is the severity of Mother's drug addiction concerning, but her inability to take responsibility for her past actions does not bode well for the future. "It is curious given that, that at no time did she ever express any concern, regret, remorse, guilt, anxiety about her incarceration and her unavailability to the children." *TPR Tr. at 30:23-25-31:1-4.* This inability to take responsibility for her addiction issues and her role in her children

9

being in placement shows that there is no end in sight for Mother's incapacity as a parental figure.

Mother is currently incarcerated and has pending charges in Warren County and New York State. Her release date from prison is not specifically known at this time, but regardless, she will be facing potential prison time for the new charges. Coupling that with the fact that in the expert's opinion, the Mother has a great amount of difficult work to do in order to be mentally and emotionally available for her children, it is apparent to the Court that she would not be able to remedy her incarceration and/or addiction issues within a year. "[E]ither way in which she wants to frame this, it comes out poorly with respect to her parenting. And, I really rather think that her state of mind is one of fixing blame on others." *TPR Tr. at 64:5-9*. Most telling is Mother's own opinion regarding the timeline of her potential recovery: "I mean, I think it will be longer than a year, to be completely stable...I am not going to be able to give them what somebody else can give them, obviously, right away. I am not going to be able to. I know this. I have a lot to work on." *TPR Tr. at 139:3-9*. Considering the opinion of the expert and Mother herself, there is clear and convincing evidence that Mother's incapacity as a parent cannot and will not be remedied.

Father claims that he did not have an incapacity, abuse, neglect, or refusal related to Children and that evidence shows that any incapacity can and will be remedied in the near future. Father has continuously placed the importance of finding and using drugs over the welfare of his daughters. He only lasted in rehab for nine (9) days and continuously missed drug and alcohol therapy appointments, ignored phone calls, and avoided house calls from his case workers. When Connie Snyder, a case worker for Warren County CYS, was asked about obtaining progress reports on Father's treatment, she responded by saying, "It was never really any

10

progress made." *TPR Tr. at 115:19*. While having every opportunity at his disposal, and the unwavering support of therapists and caseworkers, Father made no actual attempt at facing and overcoming his addiction issues, even with the knowledge that it was his only option in getting his daughters back. Father is currently incarcerated and even if he were to be released within a year, his lack of compliance with drug and alcohol treatment in the past does not give the Court much hope for the future. In addition, not only did Father not complete his entire evaluation with the expert, Dr. Korff, but he did not return to the hearing after the lunch break and did not testify on his own behalf. These actions alone speak volumes about his blatant refusal to be a parent and the fact that his incapacity as a parent is unwavering.

The third issue raised by both Mother and Father is whether the Court erred in finding that Warren County CYS proved by clear and convincing evidence that Children were removed from their care by the Court or under voluntary agreement with an agency for a period of at least six (6) months, the conditions which led to the removal or placement of Children continue to exist, Mother and Father cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to Mother and Father are not likely to remedy the conditions which led to the removal or placement of Children within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of Children. **Pa. C.S.A. §2511(a)(5).** Warren-Forest Human Services took dependency of Children in June 2018 because Mother and Father were homeless and both tested positive for methamphetamine. Currently, both Mother and Father are incarcerated and all resources of services and assistance have been exhausted.

Mother claims that she presented evidence to show that she was working to address the concerns that led to the removal and placement of Children. She also claims that she was

11

utilizing the services available to her and that any limitations to performing her parental duties would be rectified within one (1) year. Mother is attempting to get into a drug and alcohol program while incarcerated however, she had the opportunity to benefit from these types of programs before she was incarcerated, and she did not do so. In September 2018, the Court ordered drug and alcohol treatment for both parents, yet Mother made every attempt to keep her case worker in the dark regarding her progress. "[W]e were having problems with, especially Mother revoking releases. So, we would no longer be able to speak to providers about how she was progressing." *TPR Tr. at 109:24-25-110:1-2.* This behavior leads the Court to believe that this type of behavior will happen again upon her release from prison. Mother and Father were given funds through the rehousing program after their stay at Faith Inn which allowed them to pay a deposit and rent on a residence. However, since both are currently incarcerated, they can no longer maintain that living arrangement. Mother was arrested for furnishing false urine at the time of a random drug test while engaging in drug and alcohol treatment and she only maintained employment for a matter of weeks. Mother has taken advantage of any services and assistance available to her, and these programs have done nothing to rectify her situation. As such, the Court does not find any evidence presented to show that she will treat these same services and assistance any differently if and when she is released from prison. The Court will address the issue of any possible negative impact on Children in its **23 Pa. C.S.A. §2511(b)** analysis in the final portion of this Opinion.

Father claims that he can remedy the conditions that led to the removal and placement of his daughters in a reasonable time by using available services and/or assistance. He also claims that termination of his parental rights would have a negative impact on Children. Connie Snyder, Mother and Father's caseworker provided constant, ongoing, and meaningful services

12

for both Mother and Father. They both participated in drug and alcohol treatment and mental health evaluations. Father only lasted in rehab for nine (9) days and picked right up where he left off with his drug use. He lied about being in remission from his drug addiction during his mental health evaluation in order to avoid having to participate. When Father met with Dr. von Korff to be evaluated for the termination hearing, he did not fully participate. "I received a blank answer sheet in return. I wasn't really surprised. Father had a very challenging interview with me. It was very emotionally draining for him to do the work we had to do." *TPR Tr. at 38:5-8*. This is just another example of Father's inability to do what needs to be done in order to get his children back.

Mother and Father were also given free housing and then later were given the funds to put towards their own home. However, none of these services changed the behavior of Father. He continued to use drugs and continued to carelessly take all of the available services and assistance for granted without actually trying to use those services to better himself and get his daughters back. One of the most significant events that occurred which helped solidify this Court's determination regarding termination of Father's parental rights was the fact that he left half way through the termination hearing and never returned. "While Court was in recess for a lunch break, Father informed Deputy that he would not be returning for the remainder of the hearing." *TPR Tr. at 117:15-17*. He did not testify at the hearing and simply gave up and left. This Court does not believe that Father will treat these same services and forms of assistance any differently once he is released from incarceration and as such, the Court does not believe that Father will be able to remedy the conditions that led to the removal and placement of his daughters. The Court will address the issue of any possible negative impact on Children in its 23 Pa. C.S.A. §2511(b) analysis in the final portion of this Opinion.

13

The next issue raised by both Mother and Father is whether the Court erred in finding that Warren County CYS proved by clear and convincing evidence that Children were removed from their care by the Court or under a voluntary agreement with an agency, twelve (12) months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of Children continue to exist and termination of parental rights would best serve the needs and welfare of Children. The Court has already noted that Children have been in placement since June 2018, which makes their time in placement close to eighteen (18) months. As evidenced in the above analysis, the conditions that led to the removal and placement of Children continue to exist today.

The final issue raised by both Mother and Father is that it is not in Children's' best interest to terminate their parental rights pursuant to **23 Pa. C.S.A. §2511(b)**. First, "we review whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." **In re Adoption of K.M.G.** at 674 (*citing* **In re Adoption of J.M.,** 991 A.2d 321, 324 (Pa. Super. 2010)). It is well established that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." **In re Adoption of K.M.G.** at 674 (*citing* **In re C.M.S.,** 884 A.2d 1284,1287 (Pa. Super. 2005)). The emotional bond between Children and their parents is very important as well as the negative effect the termination could possibly have on Children. Dr. von Korff freely admitted that there were good aspects of the relationship between the parents and Children. "I don't think these kids could be as well-adjusted as they are given their history and their current circumstances, if there hadn't been good moments with their parents." *TPR Tr. at 32:15-18.* However, good moments from the past do not make up for the uncertainty Children are presently facing. Dr. von Korff noted what is most important for Children right now: "These

14

are children who will be benefited by having permanency in a secure environment as soon as that is possible. And, both permanency and security are things that the children very much need." *TPR Tr. at 45:19-22*. Until they were put in placement, Children were living a transient existence by residing in cars, hotels, and on available couches at their parents' friends' homes. There was neither a sense of permanency nor security in their lives. While Dr. von Korff believes Children will experience the loss of their biological parents, he also believes that finding them a secure and permanent home is of more importance at this crucial time in their young lives. "I certainly think that the children faced with two dilemmas are better off having security at the age of three and four and permanency, then, and then addressing the loss issues." *TPR Tr. at 61:1-5*. The negative impact the Children will experience because of their parents' parental rights being terminated will be outweighed by the positive impact of finding a permanent home where they will find much needed security and stability.

While the Court believes the parents love Children, that love does not mean that the parents' rights cannot be terminated. "[T]he orphan's court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship." **In re Adoption of K.M.G.** at 675 (*citing* **In re A.D.,** 93 A.3d 888, 897 (Pa. Super. 2014)). Dr. von Korff performed bonding and attachment evaluations for his expert report, but it is important to note that he never actually witnessed the parents interacting with the children. "[T]he Court had decided that Father and the children should not have contact. And, Mother indicated that she did not want the children brought to the jail, so no opportunity was afforded to meet with the children and parents jointly." *TPR Tr. at 15:8-14*. While Dr. von Korff points out that Children are affectionate, warm, and comfortable with a wide variety of adults, he does not solely attribute their well-adjusted

15

behaviors to be solely based on their bond with their parents. "[M]y inclination is to suspect that a good deal of the security that they show right now is a function of living within the stable environment." *TPR Tr. at 48:14-17*. Although there has been a loving relationship between parents and Children, there has not been any significant time spent alone as a family in over a year and a half. Children have become close with their foster parents and have not seen their parents since they were incarcerated in July 2019, and according to their caseworker, they do not ask about their parents anymore. *TPR Tr. at 188:10*. Dr. von Korff ultimately makes it clear that regardless of any parental bond, the termination of their parental rights is in Childrens' best interest. "I believe they have received many episodes of warm parenting from Father and from Mother but, they have also been subject to a great deal of chaos and uncertainty and unavailability of their parents, either because they are incarcerated or they are drug involved or they are drug seeking or they are not available…It's quite a happy finding that the children are as well as they are. But, I would strongly encourage that the Court and the agency find means to give them permanency as soon as possible." *TPR Hearing Tr. 46:1-13*.

Finally, Mother and Father should have their parental rights terminated because their children were put into placement because of their choices and actions. They had full control of their decisions to be homeless, unemployed, and seekers and users of drugs. While the Court understands the complexity and devastation of addiction issues, it is ultimately up to the parents to give their best efforts to use the services and assistance available to them in order to get their lives on track so they can be parents to their daughters. "Frankly, I think the worst-case scenario for these girls is for them to come to believe or come to a reality that they begin to interact with these parents again, followed by the inevitable relapse, reincarcerations. I think that is most likely what would happen if we gave these parents another chance. And, I think that would be

16

devastating." *TPR Tr. at 265:13-22*. Mother and Father have both demonstrated that they are not able to provide safety, permanency, and stability for Children and as such, it is in their best interest for Mother and Father's parental rights to be terminated.

For the reasons stated above, the Court finds that Warren County CYS provided clear and convincing evidence to support the termination of Mother and Father's parental rights.

No further Opinion shall issue.

BY THE COURT:

January 22, 2020

_____
GREGORY J. HAMMOND, J.